The next case this morning is 19-1490 and 19-1602 United Nurses & Allied Prof. v. NLRB Good morning, Your Honors. May it please the Court. My name is Chris Colaci. I come before you on behalf of the United Nurses & Allied Prof. I will refer to as the Union going forward. I will also refer to the NLRB going forward as the Board. The case before you for review is a case in which the NLRB announced two new rules of law departing from a clear prior Board precedent. In one instance, contrary to settled Supreme Court precedent, the Board announced that lobbying expenses occurred by Union are per se non-chargeable to non-member objectors. It does not matter whether those activities are germane to negotiations, contract administration, or grievance adjustment, which is the standard set forth in the Becker case. Well, they didn't say that it doesn't matter whether it was germane, did they? They gave meaning to the ambiguous theories as to what is germane, and that's where they drew the line. Well, that is where they drew the line, but I think it's inescapable that the activity in question below in that case in Beck was lobbying activity. And so, as far as that matter is concerned, I don't think that the Board can say with any force consistent with Beck that that did not touch on the issue of lobbying expenses. The Board also said that it really doesn't matter whether or not the activity in issue is normally or reasonably employed to implement or effectuate the duties of a union as a bargaining agent, which is the holding in the Ellis case. And the Board also did not take into account what the Leonard Court said, which is that expenses that are incurred with regard to lobbying that are for, for example, appropriations for a collective bargaining agreement, that those are also chargeable. So, based on this decision and this new rule of law, none of those things matter, according to the NLRB. That's the first new rule of law that they announced. Hold on a second. I thought Leonard, maybe I've got the cases mixed up, but I thought Leonard was a public employee. He is. It is. So, they're not opining that appropriation, are they? Maybe for a public union to fund a negotiated contract, that that would be out of bounds. The only reason, Your Honor, why I raise Leonard, it was one of the four cases upon which the Board relied to announce this new rule that lobbying expenses are per se non-chargeable. Because hasn't the Supreme Court said that drawing the line here between what's chargeable and not chargeable is amorphous, calls for judgment, but it's a lot easier and more clear-cut in the private sector than it is in the public, because in the public, the government is the employer. I think you're referring to the holding in the Janus case? They've said it, I think, I thought they said it may be in Harris as well. Yeah, they may have said it in Harris, but in the Harris decision and also in the Janus decision, the Court made particularly clear that while matters that have to do with terms and conditions of employment are matters of, this may not be the exact words, political import, that they also said that's generally not so in the private sector, precisely because in the public sector, the employer is the government. Now, the second new rule that they announced was this rule that at the time that the union provides its major categories of expense to an objecting non-member, that that point of impact that they also have to provide a copy of an audit verification letter. And they arrive at that conclusion and they make that announcement for that new rule based on two findings. One is that they claim that the absence of that letter in this case resulted in uncertainty for these objectors, uncertainty as to whether or not the expenses that the union made or claimed to have made were not actually made. And there is absolutely zero in the record, and I briefed this at length in my reply, I believe, Your Honor, there is nothing in the record that there was any uncertainty. Could you help us on a practical point? Why would the employer not want to show the letter to the union? And the employer is saying, these have been audited, and the union says, well, could you show me the audit letter? And why would the employer just show them the audit letter? What's the downside? I think, Your Honor, the question you're asking is why the union would object to providing that letter to the objector. The only reason that we would object to that is at this stage of disclosure, what the case law says, and it's absolutely clear, I've cited all of the board case law, is that what's important at this stage of the game is getting these folks, the union's major categories of expense, making sure that the union tells these folks, this is the percent of that expense that is chargeable in our view, and this is the percent that is not. Let me try again. How does it possibly harm the union to show the employee the letter? I don't think there is any harm in that. I think what we say in our papers, Your Honor, is simply this. It makes sense to us to provide information that is relevant at this stage of the process. But isn't it always relevant that the non-members of the union, just the same way that they don't have to take the union's word for what the expenses are, that the union has to have those expenses verified through an audit. The non-member also doesn't have to take the union's word that they have been verified by an audit, show them the audit verification letter. It's no burden on the union, and it's a large benefit to the non-member, and it's a benefit to the board and the courts because it's a way to avoid litigation. Well, on that last point, Your Honor, I would respectfully disagree in that. I don't think it will result if we now have to provide that letter. And I'm not saying that it is a burden to simply provide it. I'm not saying that. But it will lead to more litigation if at this stage of the game we're putting that letter in because here's the presumption that the board needs. If you don't take the non-member's word for anything, why should they have to take the union's word that, oh, yes, our financial statements have been audited and here are the major categories? What rationale is there for saying take our word for it? Because that's the alternative to giving them the certification letter. First, Your Honor, we don't challenge the word of any of our members or the Beck objectors, but that's not my question. If I may come back to your point about the litigation, what we say in our papers is that the presumption that the board makes is that the union should not be trusted when it says that the figures have been verified. And what I say in my papers, Your Honor, is that if we are required by law to provide the letter, I think what will happen now is that you will find people saying, well, hold on a minute. We want documentation from the union to make sure that the qualifications and the experience of the auditor who did the verification is submitted to us. Well, that's another reason. If the board may well say you don't have to do that. Okay. All right. The other reason why the board made this announcement of the second new rule is because they claim that the absence of the letter prevented the Beck objectors from making an informed decision about the union's chargeability calculations, the percent that they assigned. That was chargeable and non-chargeable. And the Supreme Court in Knox and the Supreme Court in Harris and board law makes quite clear that that letter just simply does not assist in any respect in helping an objector determine whether or not to challenge the chargeability calculations. Here's how it helps. When you ask the union, have you just been audited? And they say yes. And you say, could I see the letter? And you know that if they have a letter, it costs them zero to show it to you. And they say, we're not going to show it to you. Well, I can see where your average employee who is at all antagonistic with the union may start wondering whether there is such an audit. And so the NRB says, show it. Understood. Understood. So as I say, in terms of that second new rule, there isn't any evidence in the record on the uncertainty. There's no record in the evidence on preventing them from making an informed decision. In terms of the Supreme Court precedent going back to the chargeability issue, the Supreme Court has never held, it has never held, not in Street, not in Beck, not in Leonard, none of these cases, that these expenses are per se non-chargeable. The court has always said that there is a case-by-case analysis, simply put. Let me ask you this. When you're talking about private employers, is it likely to be the case that it would be an unusual circumstance in which lobbying would be chargeable? In the private sector setting? Yes.  I think it would be unusual. And so it's also fuzzy as to which is, under your theory, proper and which is not. Why can't the NRB say, look, we're just going to have a bright-line test here. Lobbying, which is well-defined if the register is a lobbyist, not chargeable. Rather than getting into potential litigation about those unusual cases, which arguably might have something to do with the collective bargaining. Because it's been long-standing public policy, Your Honor, that because the union is under a legal obligation to represent all folks, whether they are members or not, that they have to pay their fair share of the costs that we incur in doing that. And if you look at two particular pieces of legislation that we wanted to highlight for the court in our papers, one was a piece of legislation that we lobbied in Rhode Island that called for payments to be made from the state to a hospital. And the collective bargaining agreement said that when that money comes in, it has to go to pay increases for bargaining employees, whether they're objecting members or not. Similarly, through a mental health funding, we lobbied for that. And the collective bargaining said, one, that the employer and the union would cooperate together at the state house, and two, when the money came in, if it did, it would go to pay increases. So our work in that regard, coming back to your question, I would say that there isn't any reason in our view, respectfully, that folks should pay their fair share of those expenses. In Harris, the court talked about the line between chargeable and unchargeable and said how amorphous and subject to judgment it could be in the private sector, use the words amorphous and vague, in the public sector. It then said in the private sector, the line is easier to draw. Collective bargaining concerns the union's dealings with the employer. How does the lobbying here, in this case, that you're seeking to charge, concern the union's dealings with the employer? In the way that I just described, Your Honor, I tried to use those two examples. There were seven pieces of legislation, but I tried to use two. So the connection there is where we actually negotiated right into the collective bargaining agreement that money that came from those lobbying activities would go into wage increases for members, regardless of whether they're members or not. I'm sorry, go ahead. It just seems to me that that opens up, that if that's the determinative fact, that opens up a loophole big enough to drive a Mack truck through because the nonmember is powerless to influence what the union and the employer put in the collective bargaining agreement and the CBA can often wind up with references to matters that the union knows are going to be the subject of legislation. So that can't possibly be what determines whether or not nonmembers are charged, in my view. Well, Your Honor, I would say that employers are not powerless in order for us to become the bargaining representative. Employers aren't powerless, but the typical employer is relatively indifferent to whether particular expenses are or are not going to be charged to nonmembers. The employer has got to bargain with the union, whether that's grudgingly or willingly, and the nonmember and the employer have very little direct contact in that respect. Well, but that's the relationship as the bargaining agent, is that you represent those folks and you do so in good faith. The last thing that I would touch on is there are two other arguments I won't spend a lot of the Court's time on. One is that I think my sister at the NLRB has said that we have waived our right to challenge this decision from the Board in terms of remedial relief and having to provide the audit verification letter. In our brief, we mentioned that. We raised that and brought it to the attention of the Board that was seated by President Obama, but then was moved out because of the Nobel canning decision. And the NLRB challenged the finding that we did not violate the Act by not providing that notice. We filed exceptions and briefed it at length with that NLRB, and all of that paper was before the Obama Board. It was also in front of the Trump Board. So the notion that we waived, we would say, is simply unsupported by the evidence. And in terms of manifest injustice, I will just rest on my papers unless the Court wants me to address that here. Isn't it a rather sad commentary on public affairs that we have to refer to the Obama Board and the Trump Board? The only reason I... I'm not blaming you. I'm just making a philosophical aside. Point well taken, Your Honor. I'm going to ask you to take one more minute to explain to me the line you would have us draw between lobbying that can be recovered and not. What about, for example, legislation in the state to raise the minimum wage in a state? Unions regard that as helpful because it raises a floor that they can then negotiate from. So would lobbying in support of that under your test be recoverable? I did not think we would prevail in that regard. Why would that be different? Because it would... Let's just say it's a union where most of the employees are paid half minimum wage. I answer in the context of our union, Your Honor. We represent folks like nurses and physical therapists and people who make well over the minimum wage. But if you're an... Do you want us to adopt a test that would apply to all unions? All private unions. Do you want that some lobbying by private unions is chargeable? I'm actually not before the court asking you to adopt a test. I'm asking you to simply honor the Supreme Court's decisions that make it clear here that those expenses are not per se nonchargeable. The court has set the standard, and we believe that we complied with it. And obviously there are those who think we did not. We're not trying to establish a new standard here before this court. The standard already exists. But let me ask you this way then. That standard that you say already exists, how would it apply to lobbying for minimum wage legislation? I think if we had done that, Your Honor... No, by a union that everybody's paid at around the minimum wage. I'm really uncomfortable answering that question because it causes me to really speculate about the work of these other unions, who they represent, and what they get paid. Thank you. Thank you, Your Honor. Good morning, Your Honor. May it please the court. My name is Milakshmi Rajapaksa. I'm counsel for the National Labor Relations Board. The statutory authorization of union security agreements and compelled agency fees is highly limited. And the Supreme Court has explained this in several cases. Plainly, unions can exact funds from employees for the purposes of defraying the expenses involved in collective bargaining. And that is, as I believe the court has already recognized, collective bargaining involves dealings with the employer on labor management issues. Just as plainly, the statutory authorization, and we know this from the Street case, does not allow unions to use exacted employee funds over their objection to fund political causes or political activities. And contrary to the union's claims in this case, I have to say legislative lobbying is plainly a political activity. We know this, again, from Street, where in footnote two, the Supreme Court recognized that part of the political activity before it in that case, the pertinent political activity involved promoting legislative programs, which, in a sense, is lobbying. Counsel, it seems to me, are you suggesting that the only funds which can be chargeable to a nonmember are funds that are expended in direct dealings between the lawyer and the employer, direct negotiations between those two parties? No, and I appreciate that the board did use the word direct. What the board meant is essentially activities that have to do with the union's performance, direct performance of its representational function in dealing with the employer. So that, and this is consistent with the Ellis decision of the Supreme Court, those functions... I understand that, but if the focus is on the activities and whether or not they are consistent, sufficiently connected to the collective bargaining relationship, can't you visualize certain types of lobbying activity or certain circumstances in which lobbying might be directly affected? The test you are on under Ellis and Street and these other cases is, is it a normal incident to the union's performance of its collective bargaining function? Lobbying is not a normal incident, but even more than that... How can you say that? You mean private unions do not normally lobby as part of their representation of their members? That's contrary to my experience. It may be something that the unions elect to do for the benefit of all employees, but it's not a normal incident of the collective bargaining relationship. It's not part of their representational function. With due respect, I want to try to avoid word games here. The collective bargaining relationship is what the union is there for. That's the union's raison d'etre. You would define, I would think, normal incident by what unions normally do. In my experience, unions normally do engage in some lobbying, presumably because they think it's for the benefit of their members. Whether or not that lobbying activity should be chargeable is a different issue and the issue that we're here to determine. I'm trying to see if we can agree on some basic concepts before we tackle the real question. The union's normal incidence of collective bargaining are dealing with the employer in direct negotiations, contract administration, grievance adjustment, pursuing disputes that arise from the bargaining unit. These are the range of normal activities that occur in collective bargaining. Again, collective bargaining is fundamentally dealing with the employer. It's not dealing with a third party in the government to promote legislation. That is not a normal incident. That was the first question. I asked you whether there's a requirement here that the dealings be between the union and the employer. In your view, when you said no, that's not a requirement. It is a requirement, but there are things, for example, such as the activities that were recognized in Ellis, conventions where officers are elected. There are things that don't literally directly involve dealing with the employer, but they're necessary as an antecedent to dealing with the employer, and those are a normal incident. Those under the Supreme Court's decision in Ellis, those kinds of activities, certain kinds of litigation, social activities, those were all viewed as— But suppose in this era of the coronavirus, suppose that this union, UNAC, sat down with a manufacturer of safety masks because it was concerned that the equipment available to its members and non-members, the people within the bargaining unit, was insufficient to protect them against the coronavirus. Wouldn't those expenses, even though they involve the union talking with the last manufacturer, not with the employer, wouldn't those be chargeable expenses? I can't say for certain, Your Honor. It would depend on an assessment of germaneness under Ellis, but I can tell you in this case— The action taken by the union directly related to the safety of its members? What could be more germane than that? It's possible that that is germane, but in this case, Your Honor, what you have is political activity, which is decidedly in a different— I understand that, but before you jump to political activity, it would be nice if we could agree on a framework and a test so that we can measure it against something, because my concern, which you seem disinclined to address with all due respect, is that lobbying activity is not monolithic, that much lobbying activity, indeed perhaps most lobbying activity, I can readily envision as not being germane to the permitted purposes that non-members are chargeable for, but I'm concerned that there may be some lobbying activities which are so directly related to the interests of the members, the same interests that are involved in the collective bargaining process, that they may be related, and the board's per se rule would seem to prevent charges even for that latter group. That's what my concern is. Judge Selye, the board's decision in this case is just— it directly follows from the Street decision, which, as the board reads it, means that lobbying activity is by definition not germane. Let me give you an example, building on what Judge Selye was asking about. Nurses ask for a work rule that says, we've looked at the death rates for coronavirus, COVID-19, and any nurse over 60 should be able to decline assisting the patient, and the employer says, no, I want all the nurses to do all the patients, and that's the big sticking point in the negotiations. The employer then goes off to the legislature and asks the legislature to pass a bill saying, all registered nurses have to work with all patients no matter their age, and thus win the collective bargaining agreement by securing legislation that will mandate the point. Are you saying in that situation, the nurses' union could not go up and parry the employer's lobbying activity? The union can, of course, do whatever it feels— But that wouldn't be germane to— It's not chargeable to objectors. Are you saying it's also not germane to the collective bargaining? No. I mean, in the board's reading of these Supreme Court cases, it's not germane, because lobbying is not germane. And if you look at the cases— Well, that sounds like ipsy-dixy. That doesn't sound like reasoning. That's the reason why—explain to me why that example I just gave, the defensive lobbying by the union to parry the employer's lobbying, seeking to preempt a key position that's being negotiated in the collective bargaining. Explain to me why that wouldn't concern the dealings with the employer. In Street, for example, the Supreme Court recognized that the purpose of mandating and compelling agency fees was to prevent free riders, people who enjoy the negotiated benefits of a collective bargaining agreement, without paying for them, paying their fair share of them. It did not, by that mechanism—and this is very clear from Street— it didn't—the Congress, in enacting these laws, did not want to mandate ideological conformity. Nurses within this bargaining unit who are objectors may not agree with the union's priorities as to how taxpayer money should be spent. And the Supreme Court's decision in Street was intended in part to protect those people from having the union's views and priorities foisted. What did my example have to do with taxpayer money being spent? I'm sorry, your honor? What did my example have to do with taxpayer money being spent? The point is simply that it may be the union's view that it's in the best interest of employees to lobby for this legislation, but there may be objecting employees within the unit who don't want to pay for that because they don't agree. And the Street decision says that they don't have to pay for it. No, they don't have to pay for it if it's not germane because otherwise you are recreating exactly the free rider problem that the Supreme Court was trying to avoid. Because in Judge Keada's example, if the union is successful in defeating this legislation, non-member nurses who are over 60 are going to get the same benefit of not having to work on coronavirus clinics as member nurses over 60. So you've made them free riders, and that's the basic evil that the rule was designed to prohibit. Well, I'll just say, Judge Spellia, very briefly, that the free rider problem that the Supreme Court was concerned with in these cases, including Street and Beck, was the person who enjoys the benefits that are negotiated in collective bargaining without paying their fair share. It was not concerned with free riders as a general proposition. In this whole area, too, we actually don't even have any First Amendment issues, do we? No. Private employers. So it's all sort of odd that we're talking about these doctrines that get most developed in the public area where there's a First Amendment issue. And here, I mean, the First Amendment wouldn't keep an employer in a union from agreeing everybody had to support some lobbying activity if you wanted to work for that company. Right. In this case, the statutory provision involved incorporates some of the ideas that are in the public sector cases in the sense that employees, dissidents within a union have certain rights, and those rights, the limited authorization of union security agreements, balances and accommodates the interests of the union in having a certain baseline amount of funding for their collective bargaining activities and the interests of objectors within a union who may not agree with everything that the union sets out to do beyond collective bargaining. And with that, I will close. The Board will rest on its brief as to the remaining issues. Thank you. Good morning. Your Honors, may it please the Court, I am Glenn Taubman on behalf of Jeanette Geary, a registered nurse who initiated this case before the National Labor Relations Board ten years ago when she filed her unfair labor practice charge. I wish to make a few points this morning about the NLRB's rather narrow and unsurprising ruling that nonmembers cannot be required to pay for union lobbying efforts with the government, a position that fits comfortably within all of the Supreme Court and circuit cases. To go right to some of Your Honors' questions, nobody is saying that unions cannot lobby. The question is whether they can force and get employees fired for nonpayment of expenses regarding that lobbying, regarding the positions that unions take on public policy issues. In Street, Justice Frankfurter dissented and said, of the kind that Your Honors mentioned in the hypotheticals should be chargeable. The Supreme Court did not accept that position. I would also refer Your Honors to the decision in Miller, the D.C. Circuit opinion by Judge Silberman, obviously not controlling here in this Court, but Judge Silberman discussed the slippery slope that goes if you say that, well, some of this on issues that tug at the heartstrings about safety and worker protections, that if you allow that, you're basically allowing the other hypotheticals that Your Honor mentioned about minimum wages and so on. That certainly does not follow. In terms of other activities, the test is whether or not the activities for which the union is attempting to charge nonmembers are germane, and there's been no suggestion that because one activity is found to be germane, other activities of the same sort directed at other ends are necessarily also going to be found to be germane. It's been a case-by-case approach, and that's the approach that the later Supreme Court cases seem to instruct us to use. That same approach could certainly be used in lobbying cases. Your Honor, can I differ with you on several points? Sure. First of all, germaneness is actually not the test. Germaneness is what was criticized by, for example, Justice Scalia in the Leonard opinion. Germaneness, the Board is saying, is not the test. The test is the statutory duties test. What is the union obligated to provide the nonmember? The union is obligated to provide them collective bargaining and contract enforcement with the employer. The union has no duty to lobby the government as the exclusive representative. The National Labor Relations Act, which is what we're looking at here, we're looking at a statute that says unions are the exclusive representative for purposes of collective bargaining. But the union also has no duty to hire a hall to have union elections. Well, these are things that the union... And yet that's a chargeable expense. So there has to be a nexus, a relationship. You don't like the word germane. I read the Supreme Court cases perhaps differently. But there certainly has to be a nexus between any activity that is chargeable and the permitted purposes, which are collective bargaining, contract administration, grievance adjustment. There's no dispute about that. When Your Honor refers to the case-by-case analysis, I think that's something that the courts look at when we're in some gray area. But there is no gray area with regard to political lobbying, to political activity, for the same reasons that, again, I go back to Miller, because I think that's the best analysis of this line of cases from street and back on down. Once you open the door to the union saying, well, we have no statutory duty to lobby for these things, but we're going to do it anyway and we're going to charge you for it, that's when you start to violate the employee's rights. Now, Your Honor, Judge Kayada said, well, there's not a First Amendment issue here. And that's true. There may not be a First Amendment issue, but the NLRA, and I put this in the brief, the NLRA has a commitment to free speech on all sides. Whether you look at cases like Chamber of Commerce v. Brown or East Ex or what have you, the NLRA allows for free speech from all sides, and the Section 7 right includes the right to refrain. And so I would ask the court to look at this case from the point of view of an individual employee who wishes to exercise her right to refrain. And even if you say that's not a First Amendment right, the injury to her is the same as if it was a First Amendment right. Her money is being used for lobbying purposes that she does not agree with. That's the injury. And one last point, if I may. In Street, I submit Justice Black was correct when he said, when you have these processes which force employees to litigate year after year to pull out the microscopic amount of the dues that they should never have been charged, it's extremely burdensome on their rights. And Janice recognized that same thing as well, and actually Leonard discussed it in the concurrent opinion by Justice Scalia. You need clear lines of chargeability so that employees aren't burdened with having to come in and litigate year after year to pull out that small percentage. Now, that argument, up until the last 30 seconds, you were presenting essentially a doctrinal argument for why it's a matter of principle lobbying shouldn't be included. Now you're talking about somewhat of a pragmatic, which is, I understand, saying even if in theory there were some, like my example, little case, the transaction costs of getting that out don't justify it. Do you read anything in the board's decision as saying that the board in any way relied on that pragmatic point of the value of having a bright line test, or did the board, as the presentation so far today indicated, say that the doctrine as a matter of principle led to its holder? I think the answer to your question is yes. I do read in the board's opinion the fact that they were cognizant that there should be clear lines so that employees should not be burdened with having to come in year after year and litigate this. So what language do you see? What would you point us to in the board's decision? Well, I would point you actually to the dissenting member who criticizes the board for coming up with what she called an administratively convenient line. And my point in my brief is the board should not be condemned for coming up with an administratively convenient line. The board should be lauded for coming up with such a line because this is a huge litigation burden on a nonmember to parse their financial disclosure and then litigate year after year. And this case is a perfect example. This has been going on for ten years for a nurse to try to get back maybe $30 of her money. Yes, but most of that delay was caused by problems that have nothing to do with this case, as you well know. Yes, I do well know, Your Honor. But I will also say, and I pointed this out in my brief, the main cases California saw and others took 10 and 20 years to litigate because there's something about these cases that just seemed to take a long time. Unless the court has any other questions for me, I very much appreciate the court's time this morning. Thank you, counsel. All rise, please. This session of the Honorable United States Court of Appeals is now recessed until people, God save the United States of America, and the Honorable Court. Thank you, Your Honor.